

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:15cr 231 (RNC) |
| v. | VIOLATIONS: |
| ADAM SIEGEL | 18 U.S.C. § 371 [Conspiracy to Commit Securities Fraud] |

INFORMATION

The United States Attorney charges:

GENERAL ALLEGATIONS

Unless otherwise indicated, at all times relevant to this Information:

The Defendant

1. Defendant ADAM SIEGEL ("SIEGEL") was a Managing Director at RBS Securities Inc. ("RBS").

2. In approximately July 2008, SIEGEL was hired by RBS as a licensed securities broker and senior trader specializing in trading a type of bond known as collateralized loan obligations ("CLOs").

3. In approximately February 2011, RBS promoted SIEGEL from CLO trader to Co-Head of U.S. Asset-Backed Securities, Mortgage-Backed Securities and Commercial Mortgage-Backed Securities Trading. In that capacity, SIEGEL supervised the traders assigned to trade various kinds of asset-backed products, such as CLOs and non-agency residential mortgage-backed securities ("RMBS"), which are securities within the meaning of the federal securities laws.

4. SIEGEL was terminated by RBS on or about June 13, 2014.

## Relevant Entities and Individuals

5.  RBS is a global securities firm. RBS is a broker-dealer registered with the Securities and Exchange Commission ("SEC") and a Financial Industry Regulatory Authority ("FINRA") member firm. SIEGEL and traders assigned to the asset-backed products trading division worked on RBS's trading floor in Greenwich, then Stamford, Connecticut. Among other things, RBS engaged in the purchase, sale and brokering of asset-backed products, including RMBS and CLOs. RBS closed its asset-backed products trading division in or about March 2015.

6.  Matthew Katke ("Katke"), who is separately charged, began working with SIEGEL in 2003 while both were employed by Bear Stearns. Katke began as an analyst on Bear Stearns's desk that traded CLOs, before learning to trade CLOs under the direction of SIEGEL and other traders. In 2008, SIEGEL, Katke, and other Bear Stearns traders and salespeople moved to RBS. At RBS, Katke originally traded CLOs alongside SIEGEL. Throughout their time together at RBS, SIEGEL was Katke's superior. Katke resigned from RBS in May 2013.

7.  RBS's usual customers for structured products such as CLO and RMBS bonds were investment advisors and hedge funds investing on behalf of investors such as pension funds, charitable and educational endowments, and insurance companies. Dozens of RBS customers, or funds or entities managed by or affiliated with RBS customers, and their investors, are known by the United States Attorney to have been victims of SIEGEL and his co-conspirators ("victim-customers"). Certain victim-customers were affiliated with or subsidiaries of entities that received funds from the United States Government's Troubled Asset Relief Program.

COUNT ONE
(Conspiracy to Commit Securities Fraud)

8. The allegations set forth in paragraphs 1 through 7 of this Information are re-alleged and incorporated as though fully set forth herein.

9. Beginning in approximately July 2008 and continuing through approximately 2014, in the District of Connecticut and elsewhere, defendant ADAM SIEGEL did unlawfully, knowingly and intentionally conspire, combine, confederate and agree with others, both known and unknown to the United States Attorney, to commit an offense against the United States in connection with the purchase and sale of CLO and RMBS bonds, namely: to knowingly and willfully use and employ manipulative and deceptive devices and contrivances against RBS customers in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 ("Rule 10b-5"), by using the means and instrumentalities of interstate commerce and the mails, directly and indirectly, and by (i) employing devices, schemes, and artifices to defraud; (ii) making untrue statements of material facts and omitting to state material facts necessary to make the statements made not misleading in the light of the circumstances under which they were made and (iii) engaging in acts, practices, and courses of business which operated as a fraud and deceit, in violation of Title 15, United States Code, Section 78j(b) and 78ff.

Purpose of the Conspiracy

10. The purpose of the conspiracy was to benefit RBS, SIEGEL, and others, both known and unknown to the United States Attorney, including economically.

Manner and Means of the Conspiracy

11. The manner and means by which SIEGEL and others, both known and unknown to the United States Attorney, sought to accomplish the purpose of the conspiracy included the following:

a. Using materially false and fraudulent misrepresentations and omissions to take secret and unearned compensation from RBS customers in CLO and RMBS bond trades and to deprive RBS customers of information material to their discretionary economic decisions regarding CLO and RMBS trades, as follows:

i. where the buying victim-customer agreed to buy a bond from RBS at a price equivalent to RBS's purchase price plus a commission, SIEGEL and others misrepresented the price that RBS had actually paid in order to fraudulently induce the victim-customer to pay a higher overall price, thereby providing RBS with an extra and unearned profit at the buying victim-customer's expense;

ii. where the selling victim-customer agreed to sell a bond to RBS at a price equivalent to RBS's sale price less a commission, SIEGEL and others misrepresented the price at which the buyer had agreed to purchase the bond in order to fraudulently induce the victim-customer to sell the bond at a lower price, thereby providing RBS with an extra and unearned profit at the selling victim-customer's expense; and

iii. in transactions in which SIEGEL and others sought to sell a bond from RBS's inventory to a victim-customer, SIEGEL and others misrepresented to the victim that RBS was buying that bond from a fictitious third party seller in order to fraudulently induce the victim-customer to pay an unwarranted "on top" commission, thereby providing RBS with an extra and unearned profit at the buying victim-customer's expense;

b. Permitting and causing RBS traders to engage in fraudulent trading practices;

      c.      Negotiating with RBS victim-customers who suspected that they had been the victims of fraudulent trading practices;

      d.      Ignoring or taking no action in response to complaints from RBS employees who were not participants in the conspiracy about fraudulent trading practices by conspirators; and

      e.      Concealing all of the aforementioned conduct from certain RBS customers and employees who were not participants in the conspiracy, in order to prevent or delay discovery and to achieve the purposes of the conspiracy.

## Overt Acts

12.    In furtherance of the conspiracy and to accomplish its purposes and objects, SIEGEL and others, both known and unknown to the United States Attorney, committed and caused others to commit at least one of the following overt acts, among others, in the District of Connecticut and elsewhere:

      a.      Between April 24, 2009 and April 29, 2009, after a selling victim-customer discovered that Katke had made misrepresentations about price in connection with RBS's April 21, 2009 purchase of the "KKR 2007-1A A" bond and complained to SIEGEL, SIEGEL participated in negotiating a resolution with both the selling and buying victim-customers;

      b.      On or about May 14, 2009, in negotiating to sell the "SYMP 2006-2 A3" bond from RBS's inventory, SIEGEL misrepresented that RBS was purchasing the bond from a third-party seller;

    c.    On or about May 21, 2010, after Katke proposed that SIEGEL misrepresent RBS's purchase price for the "WCHC 2007-1A C" bond to a victim-customer, SIEGEL replied, "you tell him... usually works better";

    d.    On or about April 13, 2011, with respect to the "PCDO 2005-5A A1" bond that RBS purchased at 95.438, SIEGEL instructed Katke and an RBS salesperson, "do NOT show 95-24 when I said we bought at 96"; and

    e.    Between May 3 and May 6, 2013, SIEGEL informed Katke that attorneys from RBS's general counsel's office had questions concerning misrepresentations that Katke had made to a victim-customer.

All in violation of Title 18, United States Code, Section 371.

UNITED STATES OF AMERICA

*/s/ Deirdre M. Daly*
DEIRDRE M. DALY
UNITED STATES ATTORNEY

*/s/ Jonathan N. Francis*
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY

*/s/ Heather Cherry*
HEATHER CHERRY
ASSISTANT UNITED STATES ATTORNEY