UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM NO. 3:15CR231 (RNC) |
| v. | |
| ADAM SIEGEL | August 2, 2024 |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The Government submits this memorandum in aid of sentencing the defendant Adam Siegel.

**I.  Introduction and Background**

The procedural and factual background of this case is documented in the Presentence Report, which includes the Government's version of offense conduct, and is incorporated by reference here.  A brief summary of relevant information follows.

**A.  Procedural History**

On December 21, 2015, in the District of Connecticut, the defendant waived indictment and pled guilty to a one-count information charging a violation of 18 U.S.C. § 371, conspiracy to commit securities fraud.  In connection with that plea, the defendant entered into a plea agreement that contained no Sentencing Guidelines stipulation.  The defendant also publicly entered into a cooperation agreement.

**B.  Criminal Conduct**

Between 2008 and his departure from the firm in 2014, the defendant was a trader and supervisor at RBS Securities Inc. ("RBS," since renamed NatWest Markets Securities Inc.), a broker-dealer firm registered with the Securities and Exchange Commission.

From 2008 until his promotion in 2011, the defendant specialized in trading a form of bond known as a collateralized loan obligation ("CLO"); in 2011, he was promoted to Co-Head of U.S.

Asset-Backed Securities, Mortgage-Backed Securities and Commercial Mortgage-Backed Securities Trading, in which capacity he supervised trading in, among other bonds, CLOs and residential mortgage-backed securities ("RMBS").

At RBS, the defendant and his co-conspirators engaged in a fraud scheme against RBS's customers, including by misrepresenting the price at which RBS bought or sold (or was in negotiation to buy or sell) a CLO or RMBS bond from a counterparty, misrepresenting the amount of commission RBS was taking from the transaction, or misrepresenting that RBS was from a fictitious third party seller when RBS actually owned the bond.  Each of these techniques caused RBS customers to pay more or accept less for the CLO or RMBS than they would otherwise have, increasing RBS's profits on trades and thus benefiting the conspirators by increasing their annual discretionary bonuses based in part on the profitability of the year's trades.  According to the PSR, this caused a total documented loss to RBS's customers of approximately $9,091,317.14 over the course of 93 fraudulent trades, although the true loss was likely much higher.  Among the defendant's co-conspirators at RBS were Matthew Katke (whom the defendant trained and supervised), RBS's general counsel at the time, and other RBS traders and salespeople working in the division.

      C.      **Cooperation**

After proffer sessions with federal investigators in April and June 2014, the defendant pled guilty in December 2015 and publicly entered into a cooperation agreement.  For nearly nine years, the defendant cooperated or was available to cooperate with the Government.

After his plea, the defendant met with federal agents in January 2016 and March 2017.  The defendant provided information and evidence used by the Government in prosecuting Jesse Litvak, a defendant who perpetrated a similar fraud at a different broker-dealer.  The defendant's statements also helped the Government to establish RBS's criminal liability.  In October 2017,

RBS entered into a Non-Prosecution Agreement, under which it stipulated to its criminal conduct, paid a $35 million penalty, and agreed to make more than $9 million of restitution payments to identified victims. The defendant also appeared on the Government's witness list in trials where defendants employed by other asset-backed securities broker-dealers were charged with similar schemes.

### D. Breach of the Cooperation Agreement

After years of cooperation, the defendant recently elected to breach his cooperation agreement.

On July 22, 2024, the defendant was requested to meet with investigators from another U.S. Attorney's Office for a voluntary interview regarding another matter. The defendant's cooperation agreement obligated him to participate in that interview, as he had agreed "to be debriefed and to disclose fully and truthfully all information concerning his knowledge of and participation in criminal activities by himself or others whether or not related to the charges to which he is pleading guilty." As of this date, the defendant has not determined whether to sit for that interview, at least in part because he must retain unconflicted counsel to advise him. The Government suggested a 30-day continuance; the defendant refused. The Government then moved to continue sentencing for 30 days; the defendant opposed. After being warned that the Government might deem his refusal to agree to be interviewed in the other matter a breach of his cooperation agreement and thus ineligible for a "substantial assistance" motion under U.S.S.G. § 5K1.1, the Court gave the defendant an opportunity to reconsider his opposition; the defendant insisted on moving forward with sentencing on August 6. Thus, the defendant has refused both to comply with his cooperation obligation and to provide himself with sufficient time before sentencing to do so.

Under these circumstances, the Government determined that the defendant had breached his cooperation agreement and was no longer eligible for a 5K motion.

## II.     The § 3553 Factors

The Government defers to the Court as to the proper sentence to be imposed, but its consideration should include the 18 U.S.C. § 3553 sentencing factors and the defendant's mitigating circumstances.

The defendant has pled guilty to participating in a serious crime. Indeed, absent mitigating factors, the § 3553 factors would counsel a substantial sentence, based on the seriousness of the offense, the need to promote respect for the law, and the need to impose just punishment. The defendant had a lead role in a conspiracy to commit fraud in the classic sense of a theft-by-trick, lying and instructing others to do the same with the specific intent of taking money they were not entitled to from unwitting victims. His conduct was made more serious because: (1) the defendant was a FINRA-registered financial professional trained in his obligations to be truthful in his business conduct; (2) as a supervisor, the defendant was in a position of authority and RBS's first line of RBS's defense against misconduct by traders, (3) the offenses were not one-off errors in judgment, but part of a years-long course of conduct involving repeated lies and deception; (4) the conspiracy caused millions of dollars in actual and intended losses to investors; and (5) the defendant's conduct, in concert with that of his co-conspirators and the participants in similar conspiracies at other broker-dealers, damaged the credibility of the market for asset-backed securities. The defendant's motivations appear to have been straightforward—in a potentially lucrative industry, the defendant was willing to engage in deception to made trades more profitable.

That said, § 3553 also requires the Court to consider other factors, as well.

*First*, as discussed above, for years the defendant cooperated with the Government. In short, he promptly admitted his own guilt, helping the Government to establish the criminal liability of RBS. But for his recent breach of his cooperation agreement, the defendant's substantial assistance would have satisfied the requirements for a reduction under U.S.S.G. § 5K1.1.

*Second*, the defendant's history and characteristics show him to have been a responsible and law abiding person for whom this crime was an aberration. While the defendant and his conspirators rationalized their fraudulent conduct as "business as usual" and thus felt empowered to carry it out repeatedly and brazenly for years, it is also true that the defendant was encouraged by his superiors to engage in fraudulent trading practices to increase the profitability of trades. Aside from the offense of conviction, the defendant has no criminal history and no violations of his release conditions for nearly ten years.

*Third*, this defendant does not pose a significant risk of recidivism. He is permanently barred from the securities industry, and thus will not be in a position to commit crimes similar to the crime of conviction. Moreover, his sentencing submission and attached letters demonstrate that the defendant has internalized the extent to which his crime and their consequences have affected his loved ones, providing a strong disincentive to future law-breaking.

*Fourth*, the Court should consider the more than nine years since the defendant's guilty plea, during which time he seemingly observed his conditions of release without knowing when his cooperation would conclude and he would be sentenced.

*Finally*, the Court should be mindful of avoiding unwarranted sentencing disparities. The Government notes that no other defendant in a related securities fraud case has received a sentence of imprisonment, even those who went to trial.

**III.     Conclusion**

The Court should weigh the seriousness of the defendant's offense alongside the mitigating factors raised by the defendant and discussed above.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700

**CERTIFICATE OF SERVICE**

    I hereby certify that on August 2, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

                                                /s/
                                  JONATHAN N. FRANCIS
                                  ASSISTANT UNITED STATES ATTORNEY